IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STATE FARM FIRE & CASUALTY
COMPANY a/s/o SARA RIVERA

            v.                    C.A. NO. 13-6732

PETROLEUM HEAT & POWER CO.,
INC, et. al.

## MEMORANDUM OPINION

SCHMEHL, J.    /s/ JLS                                 OCTOBER 5, 2016

      Plaintiff State Farm Fire & Casualty Co. ("State Farm") brought this action in the capacity of subrogee to its insured, Sara Rivera ("Rivera"), seeking to recover damages it paid to Rivera as the result of an oil spill in the basement of the Rivera home on February 13, 2013. In its Third Amended Complaint, filed after the close of discovery, State Farm contends that defendants Petroleum Heat & Power Co., Inc. and Petro-Allentown (collectively "Petro"), inter alia, negligently performed repairs on the piping and valves connecting two oil storage tanks in Rivera's basement, negligently caused oil to escape from the tanks and failed to properly address the resulting oil spill. In addition to the negligence claim, State Farm asserts causes of action against the defendants for breach of warranty and breach of contract. Presently before the Court is Petro's second motion for summary judgment. For the reasons that follow, the motion is denied.

1

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

The following facts, which are limited to those necessary to resolve the motion for summary judgment, are either not in dispute or construed in the light most favorable to State Farm:

1. In October, 2008, Rivera purchased a home at 3215 Darien Road, Bethlehem, Pennsylvania and moved there with her family soon after. (Rivera Dep. at 14.)

2. Rivera testified that at the suggestion of her Dad, she called Petro in October of 2008 and told them "I had just bought the house, I was unfamiliar with oil and needed

to get a delivery and some kind of maintenance for someone to come in and check it and keep upkeep on it." (Id. at 66-68.)

3. In October, 2008, Rivera telephonically agreed to set up a budget service plan with Petro. Rivera was billed by Petro on a monthly basis and Rivera paid Petro on a monthly basis.

4. Rivera testified that she never received any copies of service contracts from Petro and did not ask Petro for any copies of service contracts. She also testified that she was not curious about the terms and conditions of her contract with Petro. (Id. at 66-67.)

5. The only documents that Petro produced for 2008 are copies of printed receipts that Petro provided to Rivera at the time of service in 2008. (ECF 84-3, Ex. I.)

6. In April 2009, Rivera's husband upgraded the service plan with Petro. (Rivera Dep. at 192.)

7. The only document that Petro produced for 2009 is a one-page document printed front and back. The front page stated that the residence at 3215 Darien Road in Bethlehem had entered into a service agreement (Premier Plan) on November 20, 2009 and contained the total cost. The back of the page is entitled "YOUR BILLING RIGHTS." (ECF 84-3, Ex. J.)

8. The only document that Petro produced for 2010 is a one-page document printed front and back. The front page stated that the residence at 3215 Darien Road in Bethlehem had entered into a service agreement (Premier Plan) on November 19, 2010 and contained the total cost. The back of the page is entitled "YOUR BILLING RIGHTS." (ECF 84-3, Ex. K.)

9. Rivera entered into another service agreement with Petro on November 18, 2011 for 2012. The document produced by Petro for 2011 contained the same one-page printed front and back document as in 2009 and 2010, but also contained an additional three pages printed front and back, for a total of six pages. (ECF 84-3, Ex. L.)

10. The additional three pages consisted of a description of the Petro Premier Service Plan, including a section called "General Terms and Conditions." (Id.)

11. The following paragraphs from the "General Terms and Conditions" section are relevant to the motion before the Court:

> Paragraph 2, entitled "SERVICE," states:
>
> We will provide service (including parts and labor) as set forth on our service brochure and the front of this Agreement and subject to these terms and conditions. Our acceptance of this Agreement is subject to equipment conditions at the time of the first service call.
>
> Paragraph 5, entitled "YOUR RESPONSIBILITIES," states:
>
> YOU ARE RESPONSIBLE FOR THE FOLLOWING ITEMS, WHICH ARE NOT COVERED BY THIS AGREEMENT: VENTING AIR FROM THE HEATING SYSTEM; […]MAINTAINING THE CONDITON OF THE CHIMNEY, FUEL OIL TANK, OIL LINES AND PIPING; AND SCHEDULING SERVICE CALLS AND TUNEUPS[…]
>
> Paragraph 11, entitled "FUEL TANK, OIL PIPING and ENVIRONMENT AND LIABILITY DISCLAIMER," states:
>
> Under no circumstances are we obligated to repair or replace a tank, oil lines and/or piping. You are responsible for maintenance of the fuel tank, oil lines and piping. We assume no liability for same. This Agreement does not insure against tank or oil line leakage or any damages to persons or property resulting from tank or oil line leakage. This Agreement does not cover any

4

installation, cleanup, removal, remedial, or other costs of compliance with any environmental or other laws, rules or regulations. We are not liable to render any service for which we are not licensed. WE WILL NOT BE RESPONSIBLE FOR BODILY INJURY, A DECREASE IN PROPERTY VALUE OR PROPERTY DAMAGE ARISING OUT OF THE DISPOSAL, DISCHARGE, DISPERSAL, RELEASE OR ESCAPE OF OIL OR OTHER PETROLEUM SUBSTANCES OR DERIVITIVES INTO OR UPON YOUR PROPERTY, SURROUNDING PROPERTY, THE ATMOSPHERE, OR ANY WATER COURSE OR BODY OF WATER UNLESS DIRECTLY AND SOLELY CAUSED BY OUR NEGLIGENCE.

Paragraph 12, entitled "WAIVER OF SUBROGATION RIGHTS,"

states:

Both Buyer and Seller do hereby **mutually waive any and all rights of subrogation** and or recovery, against each other, including our officers, members, agents and employees, **occurring on or arising out of this Agreement, the delivery of heating oil, and any system service or repair at your premises to the extent such loss or damage is covered by proceeds received from casualty, homeowners or other insurance carried by the other party.** The party sustaining such loss shall have no right of recovery against the other party, or the agents, servants, contractors or employees of the other party; **and no third party, including but not limited to any insurance carrier,** shall have any right of recovery **(whether based in tort, contract or otherwise) by way of subrogation** or way of assignment or otherwise. (emphasis added.)

Paragraph 18, entitled "ENTIRE AGREEMENT," states:

We and you agree that this Written Agreement along with the Service Brochure constitute the entire Agreement. Any statements not contained in this Agreement or the Service Brochure are not part of this Agreement. To the extent the terms of this Agreement and Service Brochure are inconsistent, this Agreement shall control.

(Id.)

12. Plaintiff entered into another service agreement with Petro on November 21, 2012. Other than the change in dates, this agreement was identical to the 2011

5

agreement. (ECF 84-3, Ex. M.)

13. This service agreement was in effect at the time of the oil spill on February 13, 2013.

14. Although Petro's representative, Jose Pellecer, testified that the "General Terms and Conditions" had not changed since before 2008 and that at least since 2008 they included the waiver of subrogation clause (ECF 87-6 at 178), Petro did not produce any General Terms and Conditions for the 2008-2010 Service Agreements.

15. On January 24, 2013, a Petro technician, Randy Althouse ("Althouse"), performed repair work on the piping and valves connecting the two oil storage tanks at the Rivera residence.

16. On February 13, 2013, the oil spill occurred at the Rivera residence during the delivery of heating oil. This was the first delivery of heating oil after Althouse had worked on the piping and valves on January 24, 2013.  There had never been another oil spill at the Rivera residence from the time Rivera moved in in 2008.

17. Albert Abbatiello ("Abbatiello") avers that he has been the Senior Director of Operations at OSG Billing Service's ("OSG") Eastern Production Facility in Carlstadt, New Jersey since June, 2012 and is familiar with the operations of that facility. (ECF 76-2, ¶¶ 1, 7.)

18. Abbatiello avers that OSG utilizes an Automated Document Factory (ADF) system that monitors the course of each piece of mail by both camera and bar code tracking. (Id., ¶ 8.)

19. OSG validates the number of pieces to be sent with each mailing prior to final presentment to the U.S. Postal Service acceptance clerks. (Id., ¶ 9.)

6

20. OSG places the validated number of pieces into envelopes with the corresponding addresses provided by clients prior to final presentment to the U.S. Postal Service acceptance clerks. (Id., ¶ 10.)

21. OSG submits all prepared mailings to the U.S. Postal Service as either First Class or Standard mail. (Id., ¶ 11.)

22. OSG has handled the production and transmission of invoices and service contracts for Otep of Pennsylvania, d/b/a Petro ("Petro") from 2008 until the present. (Id., ¶ 12.)

23. OSG handled the preparation and printing of invoices and service contracts from Petro to Sara Rivera ("Rivera") at 3215 Darien Road, Bethlehem, Pa 18020. (Id., ¶ 13.)

24. OSG received a data file from Petro containing Service Agreement documents on November 18, 2011. This date was assigned the Ticket ID number 50494326 by OSG's ADF. (Id., ¶ 14.)

25. OSG record's indicate that 8,322 Petro Customer documents were included in this file. OSG has verified that all 8,322 documents in this file were printed, placed in envelopes, and mailed on November 23, 2011 in accordance with the procedures described above. OSG has verified through its OSG View Plus product that Ticket ID Number 50494326 contained Exhibit 1, including the Service Agreement and General Terms and Conditions, dated November 18, 2011 for one Sara Rivera, which was mailed in its entirety. (Id.)

26. OSG received a data file from Petro containing Service Agreement documents on November 21, 2012. This data file was assigned the Ticket ID Number 50585890 by

OSG's ADF. OSG records indicate that 9, 277 Petro Customer documents were included in this file. OSG has verified that 9,276 documents in this file were printed, placed in envelopes, and mailed on November 24, 2012 in accordance with the procedures described above. OSG has verified through its OSG View Plus product that Ticket ID Number 50585890 contained Exhibit 2, including the Service Agreement and General Terms and Conditions, dated November 21, 2012 for one Sara Rivera, which was mailed in its entirety. (Id. ¶ 15.)

27. OSG presented the 8,322 documents contained in Ticket ID number 50494326 to the onsite U.S. Postal Service clerk, which were accepted by the U.S. Postal Service clerk and inducted into the U.S, Postal Service mail stream on November 23, 2011. (Id., ¶ 16.)

28. Abbatiello testified that the total number of documents that were actually mailed on November 23, 2011, according to OSG's postal receipts, was 8,316. Abbatiello attributed the discrepancy to the 8,316 documents being limited to first class one or two ounce letter mail and not including flats and foreign mail. (ECF 87-2 at 72-73, 74.)

29. OSG presented the 9,276 documents contained in Ticket ID Number 5058590 to the onsite U.S. Postal Service clerk, which were accepted by the U.S. Postal Service clerk and inducted into the U.S. Postal Service mail stream on November 24, 2012. (Id. ¶ 17.)

30. Abbatiello testified that the total number of documents that were actually mailed on November 24, 2012, according to OSG's postal receipts, was 9206. Abbatiello attributed the discrepancy to the 9206 documents being limited to first class one or

two ounce letter mail and not including flats and foreign mail. (Id. at 72-73, 76.)

31. Abbatiello testified that he does not know if the mail allegedly sent to Rivera was returned to sender, because the sender list on the output generated by OSG lists Petro-Allentown as the sender and provides Petro's address on Farm Bureau Road as the return address. (Id. at 69-70.)

32. Rivera testified that beginning around September 2012, the mail "would just come late and it would go a couple of days where we wouldn't get any and then it would be a bunch." (Rivera Dep. at 36, 48.) However, Rivera testified that "[w]e were getting mail." Id. at 48.)

33. Rivera testified that she complained to the Post Office "sometime during February" of 2013, "[a]fter the oil spill." (Id. at 39.)

34. Rivera testified that when she receives bills in the mail, she only keeps the payment stub and throws everything else away. (Id. at 82-83.)  She only keeps what she needs to mail back in or what has contact information on it. (Id. at 81.) She throws out her bills as soon as she has paid them, usually within one month of receiving it. (Id.)

35. Rivera testified that she receives invoices from Petro every month at her 3215 Darien Road address. (Id. at 196.)

36. Rivera did not expect to get something in the mail that would explain her service plan. ( Id. at 237.)

37. Rivera testified that she did not receive copies of the Service Agreements containing the General Terms and Conditions in either 2011 or 2012. (Id. at 201-204.)

38. Rivera testified that she could not offer any reason to support her belief that she did not receive copies of the Service Agreements for 2011 and 2012 which contained the General Terms and Conditions in the mail. (Id. at 205.)

39. Rivera could not remember any days in November, 2012 other than Sundays and national holidays when she did not receive any mail. (Id. at 44, 45.)

40. Rivera testified that there is no set person who gets the mail every day, but that she was responsible for opening and paying all bills from Petro. (Id.)

Petro argues that it is entitled to summary judgment on all of State Farm's claims because the 2012 Service Agreement between Petro and State Farm's insured, Rivera, contained the waiver of subrogation clause detailed in Finding of Fact #11.

Subrogation permits an insurer that has paid its insured to assert the insured's rights against the tortfeasor and thereby recover its payment. Universal Underwriters v. Kacin, 916 A. 2d 686, 692 (Pa. Super. 2007). The freedom to execute contracts also includes the freedom to release a party from its liability for its own negligence. Id. "Since an insurer's right to subrogation is limited to the rights of the insured, and there can be no subrogation where an insured has no cause of action against a defendant, an insurer has no subrogation claim against a party to an agreement where the agreement entered before the loss releases the tortfeasor." Id. at 693. Moreover, because the right to subrogation is derivative in nature and flows entirely from the insured's rights, the fact that insurers are not parties to the original contract between the insured and the tortfeasor nor had notice of the provision is not relevant.

The subrogation clause in this case purports to mutually waive all subrogation rights occurring on or arising "out of this Agreement, the delivery of any heating oil and any system service or repair." It is undisputed that Petro's technician, Althouse, performed a service repair

on January 24, 2013, the results of which, State Farm contends, caused heating oil to spill during Petro's delivery of heating oil on February 13, 2013. Petro argues that the clause provides that since the loss was covered by proceeds received from Rivera's homeowner's policy, no third party, including an insurance carrier such as State Farm, shall have any rights of recovery.

State Farm argues, however, that the waiver of subrogation contained in the 2012 Terms and Conditions is not part of any contract between Petro and Rivera because Rivera testified that she never received the Terms and Conditions of any of the service agreements, including the November 2012 Service Agreement.  Petro relies on the Pennsylvania "mailbox rule" as rebuttable proof that Rivera received the 2012 Service Agreement containing the Terms and Conditions.

The mailbox rule provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time. See Meierdierck v. Miller, 147 A.2d 406, 408 (Pa. 1959) ("The overwhelming weight of statistics clearly indicates that letters properly mailed and deposited in the post office are received by the addressee."); Philadelphia Marine Trade Ass'n-Int'l Longshoremen's Assoc. Pension Fund v. Commissioner of the Internal Revenue Serv., 523 F. 3d 140, 147 (3d Cir. 2008)("If a document is properly mailed, the court will presume the United States Postal Service delivered the document to the addressee in the usual time."). However, it has often been stated that "[a] presumption that a letter was received cannot be based upon a presumption that the letter was mailed." See, e.,g., Carnathan v. Ohio Nat'l Life Ins. Co., Civ. No. 1:06-cv-999, 2008 WL 2578919, *3 (M.D. Pa. June 26, 2008)(quoting Commonwealth v. Thomas, 814 A.2d 754, 758 (Pa. Super. 2002). Therefore, a party seeking the benefit of this presumption must present sufficient evidence to establish that the letter was actually mailed. Id. Once the presumption is

established, "the party alleging that it did not receive the letter has the burden of establishing such, and merely asserting that the letter was not received, without corroboration, is insufficient to overcome the presumption of receipt." Id. (citing Geise v. Nationwide Life & Annuity Co. of Am., 939 A. 2d 409, 423 (Pa. Super. 2007)). "The question of whether an individual item was actually prepared and mailed is purely a factual determination, and as the Supreme Court has made clear, there is no presumption applicable to the resolution of such a question." Id. (quoting Geise, 939 A. 2d at 425.)

In this case, there is no evidence upon which a reasonable jury could conclude that the 2011 and 2012 Service Agreements containing the Terms and Conditions were not mailed by Petro to Rivera. Abbatiello averred that OSG received a data file from Petro containing Service Agreement documents on November 21, 2012. (ECF 76-2, ¶ 25.) This data file was assigned the Ticket ID Number 50585890 by OSG's ADF. (Id.) OSG records indicate that 9,277 Petro Customer documents were included in this file. (Id.) OSG has verified that 9,276 documents in this file were printed, placed in envelopes, and mailed on November 24, 2012 in accordance with the procedures described above. (Id.) OSG has verified through its OSG View Plus product that Ticket ID Number 50585890 contained Exhibit 2, including the Service Agreement and General Terms and Conditions, dated November 21, 2012 for one Sara Rivera, which was mailed in its entirety. (Id.) Abbatiello further averred that OSG presented the 9,276 documents contained in Ticket ID Number 5058590 to the onsite U.S. Postal Service clerk, which were accepted by the U.S. Postal Service clerk and inducted into the U.S. Postal Service mail stream on November 24, 2012. (Id., ¶ 28.)

Although Abbatiello testified that the total number of documents that were actually mailed, according to OSG's postal receipts was 9206, Abbatiello attributed the discrepancy to

12

the 9206 documents being limited to first class one or two ounce letter mail and not including flats and foreign mail. (ECF 87-2 at 72-73, 76.) As a result, the Court finds that Petro has presented sufficient evidence that the 2012 Service Agreement was mailed to Rivera.

In addition, the Court finds that there is no inconsistency, as State Farm urges, between Abatiello's affidavit and deposition testimony as the former is limited to mailings of 2011 and 2012, whereas the portions of deposition testimony cited by State Farm refer to mailings occurring before 2011. (ECF 84 at 38-47.)

The burden then shifts to Rivera to show actual receipt. Under Pennsylvania law, mere denial, without corroborating evidence of no receipt, is insufficient to rebut the presumption that the Service Agreement was mailed to Rivera. Other than her denial, Rivera has offered no corroborating evidence to support her denial.  Such corroborating evidence could have included testimony that she was not at home during a particular mailing period, mail service was interrupted during a particular period, or that a particular item of mail was received but the contents differ from what is alleged. Instead, Rivera testified that she could not offer any reason to support her belief that she did not receive copies of the Service Agreements for 2011 and 2012 which contained the General Terms and Conditions in the mail. (Rivera Dep. at 205.)  In addition, Rivera testified that when she receives bills in the mail, she only keeps the payment stub and throws everything else away. (Id., at 82-83.)  She only keeps what she needs to mail back in or what has contact information on it. (Id. at 81.) She throws out her bills as soon as she has paid them, usually within one month of receiving it. (Id.) Rivera also testified that she did not expect to receive anything in the mail that would explain her service plan. (Id. at 237.)

Accordingly, Rivera has failed to rebut the presumption that she received the 2012 Service Agreement.

State Farm next contends that the waiver of subrogation clause contained in the 2012 Service Agreement is invalid because it constitutes an unlawful exculpatory clause. The Court agrees. This Court has already held that a waiver of subrogation of rights clause can constitute an exculpatory clause. Fed Ins. Co. v. Richard I. Rubin & Co., 1993 WL 489771, at *4 (E.D. Pa. Nov. 15, 1993). In Pennsylvania, exculpatory clauses are valid under three conditions: "First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion." Topp Copy Prods., Inc. v. Singletary, 626 A.2d 98, 99 (Pa. 1993) (citations omitted).

The Court finds that the clause at issue in this case contravenes public policy because it permits the party who is in the best position to prevent the risk of, and consequences resulting from, a residential oil spill (Petro) to simply transfer the risk to the resident's insurance company (State Farm), thereby unilaterally absolving itself as a tortfeasor from any liability in causing the spill. If Petro is permitted to be held harmless for all losses resulting from its own negligence, Petro will lose any incentive to use reasonable care in making repairs and oil deliveries. The result is that insurance companies like State Farm will become de facto insurers of a tortfeasor's negligence.

The Court is aware that Pennsylvania courts have repeatedly enforced a waiver of subrogation clause in AIA [American Institute of Architects] construction contracts. See, e.g., Jalapenos v. GRC Gen. Contractor, 939 A. 2d 925 (Pa. Super. 2007)(waiver enforceable despite apparent conflict with indemnification provision and inability of owner to obtain compensation due to its failure to buy insurance as required); cf. Kacin, 916 A. 2d 686 (Pa. Super. 2007) (waiver enforceable despite lack of notice to or consent of insurer and apparent conflict with

contractors' warranties as to materials and workmanship); <u>Penn Avenue Place v. Century Steel Erectors</u>, 798 A. 2d 256 (Pa. Super. 2002)(waiver enforceable despite public policy prohibiting exculpation of liability for negligence).

However, our Court of Appeals has explained the unique policy behind permitting waiver of subrogation clauses in AIA construction cases by observing that:

> On a construction project, the contractor risks liability for negligence and the owner risks damage to its property. The contractor purchases liability insurance and the owner purchases property insurance. If the contractor damages the owner's property, the owner or its property insurer (as subrogee) may sue the contractor for negligence. To prevent such litigation, an owner may waive its rights against the contractor for property damage to the extent covered by the owner's property insurance. *See* <u>Commercial Union Insurance v. Bituminous Casualty</u>, 851 F.2d 98, 101 (3d Cir. 1988); Kacin, 916 A. 2d at 691.This assigns losses from property damage caused by the contractor's negligence exclusively to the owner's property insurer (again, to the extent it pays the owner for damages incurred).

The policy considerations that apply to commercial construction contracts (requiring mutual acceptance of risk allocation) are simply not applicable to a consumer contract such as the one here where Petro is using the waiver of subrogation clause to insulate itself from liability by transferring its liability to the subrogee's insurance company.

The Court also finds that Rivera was at all times clearly <u>not</u> a free bargaining agent to the 2012 contract she had with Petro and thus the contract was a contract of adhesion. "An adhesion contract is defined as a 'standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms.'" <u>Lytle v. CitiFinancial Servs., Inc.</u>, 810 A. 2d 643, 658 (Pa. Super. 2002) <u>abrogated on other grounds by Salley v. Option One Mortgage Corp.</u>, 925 A. 2d 115 (2007) (quoting <u>Huegel v. Mifflin</u>

15

Construction Co., 796 A. 2d 350, 357 (Pa. Super. 2002).

The average consumer has little knowledge of the intricacies of the heating-oil industry, no chance to negotiate the provisions in residential heating oil contracts, and no choice but to accept the terms of the contract as written by the oil company. Indeed, this is exactly what happened here when Petro suddenly and unilaterally added the waiver of subrogation clause to the 2011 Agreement with Rivera. Rivera testified that she does not understand the term "subrogation" nor could she appreciate the consequences of waiving such rights.

Even if the waiver of subrogation clause is not exculpatory, the Court finds that it is unconscionable and void. Under Pennsylvania law, "a contract or term is unconscionable, and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision [procedural unconscionability] and the provision unreasonably favors the party asserting it [substantive unconscionability]." Salley, 925 A. 2d at 119-120. In this case, the waiver of subrogation clause is procedurally unconscionable since, as discussed above, Rivera lacked a meaningful choice in the acceptance of that provision. The clause was also suddenly added to the 2011 Agreement with Rivera and there is no evidence that Petro even gave Rivera adequate notice that the 2011 Agreement, as opposed to the previous Agreements, was amended and contained this new risk-shifting clause.

In addition, even though the waiver is defined as "mutual," the waiver is substantively unconscionable because the waiver is in actuality not mutual at all and benefits only Petro and not Rivera. Petro argues that an example of where the waiver is actually mutual is "if there were some leak of oil from State Farm's insured's home caused by actions or inactions of that insured that damaged the property of neighbors, and an insurer of Petro was obligated to pay sums to those neighbors for remediation, it would surely want to assert subrogation rights to recuperate

the hundreds, if not millions, it might have to pay out." (ECF 87 at 8.) Clearly, however, this a fanciful and imagined scenario that is extremely unlikely to ever occur.

Petro argues, in the alternative, that State Farm's negligence claims are barred by the gist of the case doctrine. "The gist of the case doctrine bars a plaintiff from re-casting ordinary breach of contract claims into tort claims." Mirizio v. Joseph, 4 A. 3d 1073, 1079 (Pa. Super. 2010) (citation omitted). In Bruno v. Erie Insurance Company, 106 A.3d 48, 68-69 (Pa. 2014), the Pennsylvania Supreme Court discussed the gist of the case doctrine at length and observed that "[it] has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract." Id. at 68. As the Court explained:

> In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

Id. (internal citations omitted).

The Pennsylvania Supreme Court thus reaffirmed the "duty–based demarcation" as "the touchstone standard for ascertaining the true gist or gravamen of a claim pled by a plaintiff in a civil complaint." Id. at 69. Accordingly, this Court must ask "whether the nature of the duty upon which the breach of contract claims rest is the same as that which forms the basis of the tort claim[ ]." Id. at 69, n.17.

Moreover, in explaining the gist of the action doctrine, the Pennsylvania Supreme Court emphasized that its precedent "underscore that the mere existence of a contract between two

17

parties does not, *ipso facto*, classify a claim by a contracting party for injury or loss suffered as the result of actions of the other party in performing the contract as one for breach of contract." Id. at 69.  Thus, "a negligence claim based on the actions of a contracting party in performing contractual obligations is not viewed as an action on the underlying contract itself, since it is not founded on the breach of any of the specific executory promises which comprise the contract." Id. Rather, "the contract is regarded merely as the vehicle, or mechanism, which established the relationship between the parties, during which the tort of negligence was committed." Id.

In 2012, Rivera and Petro entered into an Agreement pursuant to which Petro was to provide the Rivera home with oil and certain services in exchange for monies. It is not alleged that Petro refused to provide the oil and services under the Agreement. Such an allegation would constitute a breach of contract claim. Rather, it is alleged that Petro did provide oil and services, but that Petro provided the oil and services in a negligent manner by not exercising reasonable care. As stated by the Pennsylvania Supreme Court in Bruno, "a negligence claim based on the actions of a contracting party in performing contractual obligations is not viewed as an action on the underlying contract." Accordingly, State Farm's negligence claims are not barred by the gist of the case doctrine.

In sum, the Court further finds that there is no factual dispute regarding the mailbox rule and that Petro presented sufficient evidence that demonstrated that the 2012 Agreement was mailed to Rivera and that Rivera has failed to rebut the presumption of receipt. However, the Court also finds that the waiver of subrogation clause is both unlawfully exculpatory and unconscionable and is, therefore, void. In addition, State Farm's negligence claims are not barred by the gist of the case doctrine. As a result, Petro's second motion for summary judgment is denied.